## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

LOUDERMILK SERVICES, INC., et al.,

        Plaintiffs,

v.                        CIVIL ACTION NO. 3:04-0966

MARATHON PETROLEUM COMPANY LLC
(f/k/a Marathon Ashland Petroleum LLC), et. al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

On September 2, 2008, the Court held a hearing covering a number of issues currently pending: 1) the inclusion of fiberglass tanks in the Phase I trial of general causation, raised in Defendants' motion for clarification of the trial plan (Doc. 535); 2) Defendants' related motion to compel the production of documents or, alternatively, to exclude evidence (Doc. 707); 3) the use of a punitive damage multiplier; 4) the calculation of compensatory damages; 5) Plaintiffs' motion to exclude certain rebuttal experts or, alternatively, for more time (Doc. 711); 6) Plaintiffs' motion to Quash Defendants' Notice of Deposition of Randy Smith and Hamilton Tanks, LLC (Doc. 712); 7) the parties' motions to exclude or limit expert testimony pursuant to the standards of *Daubert v.v Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993). The Court's action on each of these motions and issues is explained below.

**1) The Court GRANTS Defendants' Motion for Clarification of the Trial Plan (Doc. 535): Fiberglass Tanks Will Be Included in the Phase I Trial of General Causation.**

The Defendant's motion for clarification advocated the exclusion of certain types of tanks from the trial of general causation. While the Court rejects the Defendants' modifications, and will include all tank types in the Phase I trial of general causation, it offers the following clarification.

The parties' positions on the issue of general causation have evolved since the proposition of trial plans. Defendants, who originally advocated a class-wide trial solely on the issue of general causation, now propose to omit a certain subset of the plaintiff class from the general causation determination. Plaintiffs, who originally opposed the trial on general causation, now advocate for the approach previously proposed by the Defendants – class-wide resolution of the issue. Clearly, an intervening event has occurred to prompt these drastic changes of opinion. This event could only be this Court's adoption of a trial plan, different from that proposed by either party. As the current trial plan instigated the controversy, it is worthy of review. The Court will also take this opportunity to clarify misconceptions the parties may have about the meaning of "general causation."

In response to an order of the Court, parties conferred in January of this year to develop a trial plan. Plaintiffs and Defendants could not reach a consensus and submitted alternate proposals to the Court. Plaintiffs' trial plan consisted of two phases: first, a trial to decide the comprehensive claims of 654 plaintiffs; second, individual trials to resolve the claims of individual class members not part of the first trial. *See* Doc. 457. Defendants proposed a trial consisting of the following four phases: 1) general causation; 2) other common issues related to the elements of each claim; 3) proximate cause and affirmative defenses; 4) punitive damages. *See* Doc. 458.

The Court reviewed these trial plans and attempted to strike a balance between the two while simultaneously dealing with each parties' objections to the opposing plan. The Court agreed with

the Defendants that issues related to specific causation would have to be tried separately to preserve their constitutional rights. The Court recognized that while a single trial of 654 plaintiffs might be efficient, the facts presented would be an amalgam of these class members' claims. The Defendants' right to raise facts and defenses specific to an individual class member would be abridged. Thus, a phase of trial to resolve individualized issues was deemed necessary. The Court also agreed with the Defendants that a class-wide trial on general causation would be valuable; all claims could be resolved if Defendants' actions were not found to be capable of causing the alleged damages. As such, the Court planned to try general causation as part of the class-wide phase of trial. Nowhere in their presentation to the Court did Defendants suggest that the general causation trial be limited to certain types of underground storage tanks; rather, Defendants sought the general causation determination for all underground storage tanks and the Court agreed.

The Court also found many valid points in the objections raised by Plaintiffs. The Court agreed that resolving as many common issues as possible in a class-wide trial would best maintain the natural flow of the trial and help the jury understand more clearly the implications of their findings. Additionally, the Court took note of Plaintiffs' objections to the class-wide trial of general causation: Plaintiffs complained that they had nothing to gain and everything to lose. If Plaintiffs did not succeed in showing Defendants' actions capable of causing harm, then Defendants would win and the litigation would cease; if Plaintiffs did succeed then they were in no better position for individual trials than if they had proceeded without class certification. Furthermore, Plaintiffs complained that the trial on general causation forced the jury to decide their claims in a vacuum, without reference to the context of their claims. The Court determined that a trial on general causation was valuable despite the fact that it would add an extra hurdle to Plaintiffs' proof of their

case and, by combining it with class-wide resolution of other common issues, Plaintiffs will stand to benefit from the increased efficiency afforded by Phase I of the trial plan. To address Plaintiffs' concerns about litigating in a vacuum, the Court added to Phase I a full trial of the representative plaintiffs' claims.

Defendants now raise two main objections to the class-wide adjudication of general causation in Phase I of trial. First, they argue that such a trial plan raises due process concerns; they cite *Broussard v. Meineke Discount Mufflers Hops, Inc.,* 155 F.3d 331 (4th Cir. 1998) and *In re Chevron U.S.A.*, *Inc.*, 109 F.3d 1016 (5th Cir. 1997) for support. Second, they argue that they will be prejudiced during the remainder of discovery because of hurdles that come with obtaining evidence from an individual not named as a party. Neither of these concerns, however, is a valid justification for modifying the current trial plan.

The appellate courts in *Broussard* and *In re Chevron* were reviewing trial plans distinct from the one set out by this Court. *Broussard* involved a class of Meineke Discount Muffler Shops franchisees, who claimed Meineke mishandled franchise advertising. 155 F.3d at 334. The district court attempted to settle the entire matter in a single class-wide trial, without opportunity for subsequent review of individualized issues. *Id.* at 336-37, 340-44 (The court decided the effect of releases signed by some class members after the main trial but other individualized issues were ignored). On appeal, the Fourth Circuit Court of Appeals uncovered numerous problems, including potential conflicts of interest among class members and the individualized nature of certain claims and defenses. *Id* at 337-40,340-44 (The appellate court discussed five such individualized issues.). In addressing the latter problem the appellate panel wrote, "plaintiffs enjoyed the practical advantage of being able to litigate not on behalf of themselves, but on behalf of a 'perfect plaintiff' pieced

together for litigation." *Id.* at 344. In short, the *Broussard* defendants were not given any opportunity to defend against individual claims even though there were many factual and legal differences between plaintiffs' claims. The problem in *Chevron* was similar. The trial plan called for the complete adjudication of 3,000 claims in a trial of 30 representative plaintiffs. *Chevron,* 109 F.3d at 1018-19. No attempt was made to analyze, much less deal with, issues which differed among representative plaintiffs or between representative plaintiffs and the rest of the class.

In contrast to the trial plans in *Broussard* and *Chevron* this Court's plan takes great pains to address each issue that requires individual consideration. It is important to understand the question to be answered during the adjudication of general causation: Were the Defendants' actions *capable* of causing the alleged harm? If this question is answered in the affirmative, it alone does not resolve any individual plaintiff's claim. Each plaintiff must independently litigate the issue of actual causation: Did the Defendants' actions *actually* (and proximately) cause the alleged harm? The present trial plan is immediately distinguishable from those of *Brousssard* and *Chevron* because individual issues are addressed on an individual basis. There will be no single composite plaintiff or resolution of individual issues through trial by representation. That is the purpose of subsequent phases of trial.

Defendants also raise concerns about discovery abuses if fiberglass tanks are included in the first phase of trial. This issue can be dealt with by careful oversight and management of the discovery process. Defendants have already pointed to one particular instance in which they feel Plaintiffs have abused the discovery process. This is the subject of the motion discussed below. The Court feels confident it will be able to fairly and competently address such concerns as they are raised. Defendants' Motion for Clarification of the Trial Plan (Doc. 535) is **GRANTED**.

**2) Defendants' Motion to Compel Production of Documents, or in the Alternative, to Exclude Relevant Evidence (Doc. 707) is Not Yet Ripe for Resolution.**

Defendant's Motion to compel documents related to tanks used as evidence during the trial of general causation, or in the alternative to exclude this evidence, (Doc. 707) is not yet ripe for resolution. As such, the Court will await a response from the Plaintiffs before ruling on the issue. The following, however, shall serve as generally applicable principles: the Court will require any materials or documents relied upon by an expert witness, including experts testifying about general causation, to be disclosed to the opposing party. Additionally, any specific documents or materials that will be offered at trial, either to buttress an expert's opinion or offered independently from any expert's testimony, must be disclosed to the opposing party.

**3) Plaintiffs Shall Have Fourteen Days from the Date of the Hearing to Explain the Bases and Plan for the Class-wide Trial of Punitive Damages.**

During the hearing, the Court explained that the use of a punitive damage multiplier *per se* did not pose any constitutional problems. It expressed concerns, however, about the application of a multiplier to the facts of this case. Plaintiffs have proposed a few theories, each of which would support an award of punitive damages, but some of which are inapplicable to the class as a whole. Generally, Plaintiffs rely on the following three theories as bases for punitive damages: 1) Gross Negligence/Recklessness in the manufacture of gasoline; 2) Fraudulent Misrepresentation that contaminated gasoline was in fact ordinary gasoline and Fraudulent Concealment of contaminants in gasoline; 3) Fraudulent Misrepresentations made during the course of Project Mountaineer.

Even at a superficial level, these three different bases of punitive damages pose problems. While the first two theories may be applicable to the class as a whole (whose members by definition all received gasoline from the Defendants during a time contaminants were allegedly present), not

all class members participated in Project Mountaineer. When examined at a deeper level, more individualized issues become apparent. For example, it is not yet known when Marathon became aware that it was selling contaminated gasoline. Class members who only received gasoline during an early portion of the class period may be in a different position than those who received gasoline at a later period. Additionally, while Defendants allegedly promulgated a misleading brochure during Project Mountaineer, Plaintiffs concede that not every class-member received the brochure.

In 1996, the United States Supreme Court established three guideposts for courts reviewing the constitutionality of punitive damage awards: 1) the degree of reprehensibility, 2) the ratio of punitive damage to the actual harm on the plaintiff, and 3) sanctions for comparable misconduct. *BMW of North America v. Gore,* 517 U.S. 559, 575 (1996). A punitive damage multiplier would work by focusing on the reprehensibility prong of the punitive damage analysis. When considering the degree of reprehensibility of a defendant's conduct, a jury may consider harm inflicted upon nonparties as a result of that conduct, and risk to the general public. *See Philip Morris USA v. Williams,* 127 S.Ct. 1057, 1063-64 (2007). The multiplier is essentially an embodiment of that analysis. Using the multiplier, a jury could make a determination of reprehensibility on a class-wide basis and decide on a number which reflects this degree of reprehensibility. That number would then be applied later to individual plaintiffs, once an individual class member's claim is adjudicated and he is found to have suffered harm from the same conduct upon which the multiplier is based. Because the multiplier is itself a ratio of punitive damages to compensatory damages it ensures a consistent and logic relationship between punitive damages and actual harm. Sanctions for comparable misconduct can be considered either during the formation or application of the multiplier.

The use of a multiplier may, however, break down when there are various bases for the assessment of punitive damages. Although evidence of harm to nonparties may inform a jury's analysis of reprehensibility, "a jury may not go further than this and use a punitive damage multiplier to punish a defendant directly on account of harms it is alleged to have visited on nonparties." *Id.* at 1064. If a jury establishes a punitive damage multiplier during a class-wide trial and a second jury applies it to an individual plaintiff who suffered from differing conduct, or only some of the conduct considered during the reprehensibility analysis, the *Philip Morris* problem comes into play. The second jury is punishing the defendant not just for the harm inflicted upon that plaintiff but also "on account of harms it is alleged to have visited on nonparties." *Id.*

Plaintiffs have fourteen days from the date of the hearing, **September 16, 2008**, to explain, in detail, their plan for the trial of punitive damages. Defendants will have ten days from their receipt of Plaintiffs' plan to respond. Plaintiffs bear the burden on demonstrating the commonality of any theory that will serve as the basis for punitive damages. If the creation of a subclass (or multiple subclasses) is necessary, Plaintiffs must explain how that subclass will be defined, which issues are common to the subclass, and how the subclass will fit into the current trial plan. If Plaintiffs choose to create subclasses they must also designate a representative for that subclass – from the ranks of the current named class representatives. Finally, and most importantly, Plaintiffs must explain how their plan is consistent with the holding of *Philip Morris*.

**4) A Better Understanding of the Evidence is Necessary to Determine the Appropriate Measure of Compensatory Damages.**

The Court's April 9, 2008 Order, which established the trial plan, recited the traditional measure of property damages under West Virginia law. In *Jarrett v. E.L. Harper & Son, Inc.* 235 S.E.2d 363 (W.Va. 1977) the West Virginia Supreme Court held,

> When [property is damaged] the owner may recover the cost of repairing it, plus his expenses stemming from the injury, including the loss of use during the repair period. If the injury cannot be repaired or the cost of repair would exceed the property's market value, then the owner may recover its lost value, plus his expenses stemming from the injury including loss of use during the time he has been deprived of his property.

Syl. Pt. 2. Originally, Plaintiffs argued this measure of damages was inapplicable. They argued that owners of damages tanks were entitled to full replacement costs without a limitation of market value, based on public policy considerations and the precedent of *Appalachian Power Co. v. Morrison*, 165 S.E.2d 809 (W.Va. 1969). In contrast, Defendants argued that the *Jarrett* measure of damages was applicable and that compensatory damages should be limited to the market value of the underground storage tanks (approximately $10,000 to $20,000 per tank). In the April 9th Order the Court rejected the Plaintiffs' theory of damages, but also refused to accept Defendants' measure of damages. *See* Doc. 519. The Order referenced provisions from the Second Restatement of Torts as inconsistent with Defendants' interpretation of *Jarrett. Id.* It also noted that this case presented a unique situation because the cost of a new underground storage tank pales in comparison with the costs associated with the installation of a tank. *Id.*

At the recent hearing, both sides articulated new theories of damages consistent with *Jarrett.* Plaintiffs propose interpreting the standard to allow for recovery of costs related to excavation and

installation of tanks as "expenses stemming from the injury." Defendants disagree with this measure. Instead they argue that the proper value of a tank is not the cost of an uninstalled storage tank, but rather, the cost of an underground storage tank *in the ground*. They do, however, contend that underground storage tanks have a limited lifespan, and depreciate over time. They argue that an appropriate measure of damage takes into account this depreciation.

It is apparent that the parties are now much closer in their positions on the appropriate measure of damages. At this stage the most prudent course is to wait for further development of the evidence before adopting a final calculation. As such, the Court will defer ruling on this issue until a later date.

**5) Plaintiffs' Motion to Withdraw Their Previous Motion to Exclude Defendants' Newly Disclosed Rebuttal Expert Witnesses or, in the Alternative, For Additional Time (Doc. 711) is GRANTED.**

On August 5, 2008, Plaintiffs filed a motion to exclude newly disclosed expert witnesses or, alternatively for additional time (Doc. 655). They subsequently filed a motion to withdraw (Doc. 711) and reaffirmed their intention not to pursue the exclusion of newly disclosed expert witnesses, at the September 2nd hearing. Plaintiffs' motion to withdraw their previous motion is **GRANTED**.

**6) Plaintiffs' motion to Quash Defendants' Notice of Deposition of Randy Smith and Hamilton Tanks, LLC (Doc. 712) is GRANTED.**

Plaintiffs filed a motion to Quash Defendants' notice to depose Randy Smith and Hamilton Tanks, LLC (Doc. 712). Randy Smith is an expert retained by the Defendants. Initially, Plaintiffs scheduled a deposition of Smith for discovery purposes. They subsequently changed their trial strategy as it concerned Smith and decided to cancel the deposition. Defendants, believing that Smith's testimony is extremely favorable, wish to preserve his testimony in the record in case he is

unable to appear as a live witness at the trial. To accomplish this, they rescheduled Smith's deposition at the same time and location as that previously prepared by Plaintiffs.

Plaintiffs now argue that they will suffer prejudice if forced to prepare for a deposition of Smith at the currently scheduled time. They contend that they will have to prepare to cross-examine him on relatively short notice; additionally, through their early cross-examination they will be forced to disclose trial strategy to Defendants four months prior to the trial date.

The Court must side with Plaintiffs on this issue, but will allow Defendants to reschedule a deposition of Smith at a date closer to trial. Although Smith's deposition was originally scheduled by Plaintiffs at the same time and place now proposed by Defendants, the fact that Defendants now wish to take the lead in the proceeding changes its nature. This would no longer be a discovery deposition but an evidentiary one – requiring far more preparation by the Plaintiffs at a stage when time is in short supply. In addition, an evidentiary deposition is premature. Discovery is not yet closed and trial is over four months away. Defendants have not offered any reason to expect that Smith will be unable to appear at trial – in fact they have stated the opposite. Defendants have retained Randy Smith as an expert and should make every effort to ensure that he is present at trial. If Defendants still wish to depose Smith at a date closer to trial, they may motion the Court to do so at that time. For now, Plaintiffs' motion to quash (Doc. 712) is **GRANTED**.

### 7) The Court Defers Ruling On the Parties' *Daubert* Motions.

At hearing, the Court heard argument on a limited number of *Daubert* motions. Eight such motions are currently ripe. The Court will defer ruling on these motions until it has had sufficient time to carefully review record. If necessary, evidentiary hearings may be scheduled on some or all of these motions.

**8) An Additional Matter: The Next Management Conference is Scheduled for October 27, 2008 at 1:30 p.m.**

Finally, it is apparent that there are still many details to address over the next few months before this case will be properly prepared for trial. As such, the Court **SCHEDULES** the next management conference for **October 27, 2008,** at **1:30 p.m.** in **Huntington, West Virginia.**

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

                                           ENTER:   September 5, 2008

                                           ROBERT C. CHAMBERS
                                           UNITED STATES DISTRICT JUDGE