IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

LOUDERMILK SERVICES, INC., et al.,

        Plaintiffs,

v.                             CIVIL ACTION NO. 3:04-0966

MARATHON PETROLEUM COMPANY LLC
(f/k/a Marathon Ashland Petroleum LLC), et. al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Costs and Award of Incentive Fee (Doc. 809). In the motion, counsel requests a fee of $6 million, reimbursement of costs in the amount of $3,134,600.53, and a $25,000 incentive fee for each of the five named class representative. Plaintiffs' counsel worked diligently and competently throughout a long and complicated course of litigation. In the end, they were able to secure a sizeable benefit for the class as a whole. For these reasons, their motion is **GRANTED in part**. Because, however, the amount of recovery available to class members is uncertain and because individual class members will only receive a slim fraction of what was expected at the outset of litigation, the attorneys' fees will not be the full amount requested. The Court **DENIES** the request for $6 million in fees and instead **ORDERS** distribution to Plaintiffs' counsel in the amount of $4,250,000 for fees and $3,134,600.53 for reimbursement of expenses (plus any reasonable amount incurred during the administration of settlement). In addition each of the named class representatives shall receive the requested $25,000 incentive.

## Background

This case arose from allegations that contaminated gasoline distributed from Marathon Petroleum Company's Catlettsburg refinery caused damage to underground storage tanks and related equipment at service stations across West Virginia. Litigation was prolonged, lasting over four and one-half years. It was unusually complicated, presenting novel issues of law and requiring investigation into numerous technical matters including the operation of gasoline refineries, the installation and maintenance of underground storage tanks, and the mechanisms of corrosion on various tank material. Throughout the course of litigation, Defendants put up a vigorous challenge, opposing class certification, the class definition, the Plaintiffs' proposed trial plan, the proposed calculation of damages, theories of liability, and the admissibility of many of Plaintiffs' experts, among other issues. Because of its involvement throughout the course of litigation, the Court became familiar with the facts, legal theories, strengths and weaknesses of the case. It was, therefore, in a strong position to evaluate the fairness of the proposed settlement and will apply its experience to the evaluation of requested fees.

The Court granted final approval for settlement in this action on March 18, 2009. *See* Doc. 818. Pursuant to the agreement, two funds will be established for the benefit of class members. The first fund (the "Cash Fund") consists of $15 million in cash to be distributed amongst the class. The second fund ("Tank Failure Fund") consists of $10 million to be drawn on by class members in the event of a tank failure.[1] To make a claim from the Tank Failure Fund, a class members must wait until one of his or her storage tanks actually fails. The class member must then convince a panel of

---

[1]Technically, this second fund is not a fund at all, but a promise by the defendants to pay up to $10 million in the even to tank failures caused by their gasoline. There is, however, no argument that the defendants will be unable to pay if called upon to do so.

experts that the failure was caused by contaminated gasoline distributed from Marathon's Catlettsburg, Kentucky refinery between February 1, 2000 and July 31, 2003. The successful class member will then receive a set amount from the Tank Failure Fund, depending upon the age of the tank. Claims can be made on the Tank Failure Fund up to ten years after settlement.

Class members themselves will be divided into three subclasses for the purposes of settlement. Subclass A members are those who were identified by Marathon Petroleum Company during it's "Project Mountaineer" as storage tank owners who received enough bad gasoline to warrant tank cleaning, paid for by Marathon. Subclass B members are tank owners who were identified during "Project Mountaineer," but who were not seen as having received enough bad gas to warrant tank cleaning. Ninety percent of the Cash Fund will be distributed to Subclass A members, ten percent to Subclass B members.[2] Subclass C members are primarily operators of gas stations with affected storage tanks. The subclass C members will not receive a payment from the Cash Fund but will be able to make claims against the Tank Failure Fund.

In the motion for attorneys' fees, Plaintiffs' counsel requests an award of $6 million in fees. This amount represents approximately 24 percent of the total $25 million which may ultimately be available to the class. In addition, Plaintiffs' counsel requests reimbursement of $3,134,600.53 in expenses and $125,000 for class representative incentives. Defendants do not oppose the request for expenses and fees, but the Court has received objections from a group of 15 organizations, which represent 300 commercial sites throughout West Virginia. While the objectors agree that 24 percent of the available fund is reasonable for the work performed in this case, they contend that this 24

---

[2]Parties estimate that with the attorney fee distribution requested by Plaintiffs' counsel Subclass A members would receive $9,3000 per site and Subclass B members would receive $3,000 per site.

percent should be calculated only from the Cash Fund. They argue that the Tank Failure Fund offers

an illusory benefit for the class and, as such, should not be valued at its full amount for purposes of

fee calculation. They also object to the reimbursement of $212,000 of the requested expenses,

which represents interest due on a line of credit opened by Plaintiffs' counsel for the purpose of

funding litigation. Objectors have no problem with the requested $125,000 incentive fee.

## Method for Determining Attorneys' Fees

In a recent opinion, Judge Goodwin, Chief Judge of the Southern District of West Virginia,

set forth a well-reasoned method for the evaluation of attorneys' fees where a class receives benefits

from a common fund. *See Jones v. Dominion Resources Services, Inc.* --- F.Supp.2d ----, 2009 WL

585782 (S.D. W.Va. March 6, 2009). As explained by Judge Goodwin,

> In calculating such fees, courts have generally employed two different methods: the "lodestar" method and then "percentage of fund" method. Under the "lodestar" method, a district court identifies a lodestar figure by multiplying the number of hours expended by class counsel by a reasonable hourly rate. The court may then adjust the lodestar figure using a "multiplier" derived from a number of factors, such as the benefit achieved for the class and the complexity of the case. . . Under the "percentage of fund" method, the court awards the fee as a percentage of the common fund. The percentage of fund method operates similarly to a contingency fee arrangement in that the attorneys receive a percentage of the final monetary value of obtained for their clients. . . .

*Id.* (internal citations omitted).

After considering the benefits of each method, Judge Goodwin opted for a hybrid approach,

similar to that used recently by many courts evaluating appropriate attorneys' fees from common

fund class action awards. *See id*; *see also*, Manual for Complex Litigation (Fourth) § 14.12; *In re*

*Royal Ahold N.V. Securities & ERISA Litig.*, 461 F.Supp.2d 383 (D. Md. 2006); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007); *In re AT&T Corp.,* 455 F.3d 160 (3d Cir.2006); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002); *In re Enron Corp. Sec. Derivative & ERISA Litig*., 586 F.Supp.2d 732 (S.D. Tex. 2008); *In re Cardinal Health*, 528 F.Supp.2d 753 (S.D. Ohio 2007).   Under this hybrid approach, a full percentage of the fund calculation is performed.  The result is then cross-checked with a rough lodestar analysis.  While more weight is placed on the percentage of the fund figure – which aligns the attorney's interests with that of the class – the use of the lodestar check helps to alleviate any anchoring effect of a proposed percentage figure and helps to ensure that the fee award is still roughly proportionate to the amount of work performed.  *Id.* (citing *In re Microstrategy,* 172 F.Supp.2d 778 (E.D. Va. 2001); *In re Cardinal Health*, 528 F.Supp.2d 753.  The Court finds that the method used by Judge Goodwin in *Jones* is applicable to this case and adopts it in the following analysis.

I.      **The Percentage of Fund Calculation**

In their brief in support of the attorneys' fees request, Plaintiffs' counsel cited factors used by the Fourth Circuit Court of Appeals in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 266 (4th Cir. 1978).  In *Barber*, the factors were used to evaluate attorneys' fees under the lodestar method.  *See id.*  While similar to factors used by courts to evaluate fees under the percentage of fund method, the *Barber* factors are not ideal when separated from the lodestar calculation.[3]  One of the main

---

[3]The *Barber* factors: 1) the time and labor expended; 2) the novelty and difficulty of the questions raised; 3) the skill required to properly perform the legal services rendered; 4) the attorney's opportunity costs in pressing the instant litigation; 5) the customary fee for like work; 6) the attorney's expectations at the outset of the litigation; 7) the time limitations imposed y the client or circumstances; 8) the amount in controversy and the results obtained; 9) the experience, reputation, and ability of the attorney; 10) the undesirability of the case within the legal community in which the suit arose; 11) the nature and length of the professional relationship between attorney

(continued...)

-5-

advantages of using a percentage of fund method is that it "ties the attorneys' award to the overall result achieved rather than the hours expended by the attorney."  Third Circuit Task Force Report, *Selection of Class Counsel*, 208 F.R.D 340 (January 15, 2002).  The result achieved should, therefore, be the most prominent factor considered in the analysis.  Because of its placement within a great many *Barber* factors, the importance of the result obtained may be diminished under that test. (The first factor listed in *Barber* is the "time and labor expended" by the attorneys, the primary factor which should be considered when conducting a lodestar analysis, but of lesser importance in the percentage of fund method.)  Instead of the *Barber* factors, this Court will use those adopted by Judge Goodwin in *Jones*: 1) the results obtained for the class; 2) the quality, skill, and efficiency of the attorneys involved; 3) the complexity and the duration of the case;  4) the risk of nonpayment; 5) awards in similar cases; 6) objections; and, 7) public policy.  *Jones* 2009 WL 585782 at *7.

### A.   While Counsel Secured a Benefit for the Class, Recovery Is a Slim Fraction of the Amount in Controversy.

In other contexts, courts have recognized, "'the most critical factor' in calculating a reasonable fee award 'is the degree of success obtained'; when 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation times a reasonable hourly rate may be an excessive amount." *Brodziak v. Runyon* 145 F.3d 194, 196-97 (4th Cir. 1998) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (both cases deciding attorneys' fees in civil rights cases)).[4]  The importance of this factor only increases in a common-fund recovery from a

---

[3](...continued)
and client; and 12) attorneys' fees awards in similar cases.

[4]It is worth noting that while both cases involved attorneys' fees for civil rights actions, they examined factors identical to the twelve enumerated in *Barber*, 577 F.3d 216, 226 n. 28.  *Brodziak* even cited *Barber* as the authority for the its framework of analysis.

class-action lawsuit, where the interests of the attorneys and their clients should be aligned to the maximum extent possible.

The $15 million Cash Fund and $10 million Tank Failure Fund are substantial benefits to the class as a whole in light of the obstacles they would have faced in ongoing litigation. When examined from the point of view of an individual tank owner, however, the terms of settlement must have also been a substantial disappointment. This observation is perhaps best evidenced by the fact that the Court received an objection from fifteen organizations representing 300 commercial gasoline vendors, all with underground storage tanks falling within the class definition. These class members

> generally believe that many hundreds to thousands of tanks will have to be replaced as a result of premature deterioration by reasons of the contaminated fuel supply from the Catlettsburg Refinery. The cost of this replacement and the associated losses from business interruption is expected to exceed many times the value of the proposed settlement.

Limited Objection of Certain Class Members at 4 (Doc. 811). While the Court expresses no opinion on whether or not tanks should now or will ever need to be replaced because of Catlettsburg gasoline, these class members have a strong point that *if* tanks must be replaced the cost will be many times that provided by the settlement.

In Plaintiffs' Memorandum in Support of Plaintiffs' Trial Plan and in Opposition to Defendants' Trial Plan (Doc. 462), counsel stated that "cost estimates obtained in connection with the removal and replacement of [underground storage tanks] ranged from a low of $319,357.50 to a high of $479,887.30." Doc. 462 at 10 n. 1. Earlier, their experts had estimated costs between $250,000 and $300,000. Under either estimate, a cash recovery of $3,000 or $9,300 per tank is only

a small fraction of the expected cost.  If a middle figure of $300,000 is used the recovery is only 1% to 3% of the estimated cost of future tank replacement.

Surely adding to the disappointment must be the fact that the class hoped to benefit from a punitive damage award.  Still pending before the Court at the time of settlement was the question of whether a punitive damage multiplier would be determined during the Phase I trial of issues common to the class.  With estimates on the order of $300,000 replacement cost per site, more than 2,000 sites at issue and a pending argument for a punitive damages multiplier, class members' valuation of the case at the time of settlement could justifiably have been well over the $1 billion mark.[5]  Thus, while $15 million in cash sounds like a large number, it pales in comparison to that which might have been recovered if Plaintiffs were successful at trial.

As a practical matter, the high costs of litigation also reduce the amount of recovery available to the class.  When the $3 million in costs are combined with the $6 million fee request, the total ($9 million) represents 60 percent of the available Cash Fund.  It gives the Court pause to approve a fee arrangement where Defendants will write a larger check to Plaintiffs' counsel than to the class.

Of course, the Cash Fund is not the only part of the settlement.  There is also the $10 million Tank Failure Fund to consider.  Even if the Tank Failure Fund were valued the same as the Cash Fund, however, it would not significantly alter the ratio of amount recovered versus the amount in controversy.  ($15 million is 1.5 percent of $1 billion; $25 million is 2.5 percent of $1 billion.)  The

_____

[5]If a class member reading the briefs from Plaintiffs' counsel were to make a conservative estimate of the value of the case, they might have figured a tank value of $300,000 times a punitive damage multiplier of two for a potential personal recovery of $600,000.  When the total number of sites, over 2,000, is factored in, one can see that a $1 billion is a conservative estimate of the amount in controversy.

matter becomes more complicated when individual recovery from the Tank Failure Fund is considered.   Under the terms of the settlement agreement' a class member can receive up to $200,000 per tank from the Tank Failure Fund.  A simple calculation, however, reveals that only fifty class members could possibly receive this amount, and fewer when one considers that costs of administration and evaluation of claims would be taken out of the fund before any claim was paid. If all 2,000 plus class members were paid out of the fund, each would receive an additional $5,000, an additional tiny fraction of the costs of tank replacement.  Thus, either a few class members could recover an amount that comes near the expected cost of replacing a tank, or many class members could receive an additional small fraction of the costs they were forced to expend.  From either a class-wide or individual member's perspective, the Tank Failure Fund does not change the settlement from a small-percentage recovery.

Objectors have also made strong points against granting equivalent value to the Tank Failure Fund and the Cash Fund.  Practically, it will be difficult to make a successful claim against the Tank Failure Fund.  A class member must wait until after a tank fails before they can attempt to recover.  Then, they must submit their claim to a panel of three individuals with "scientific and technical expertise in evaluating the integrity of [underground storage tanks.]" Settlement Agreement at 11 (Doc. 807 Exh. 1).  The class member must convince the panel members that "internal corrosion proximately caused by contaminants in the Gasoline from the Catlettsburg Refinery from February 1, 2000 through July 31, 2003 was a significant contribution factor to the resulting tank failure." *Id.* at 10.  The claiming class member will bear the initial costs of preparing the tank for evaluation and will be reimbursed only if they are successful.  Because the cost of preparation is expensive, this is likely to be a risk of tens of thousands of dollars.  Essentially, the procedure for recovery from the

Tank Failure Fund puts off the most difficult matter of proof and serves as a damage cap for Defendants.  Class members do receive the benefit of an increased statute of limitation – claims to the Tank Failure Fund can be made up to ten years after the entry of settlement – but this benefit hardly seems equivalent to cash in hand.[6]

After four and one-half years of litigation, settlement was proposed two months prior to the scheduled phase I trial of issues common to the class.  Much of the evidence to be presented at trial was on the record as *Daubert* motions were ripe and dispositive motions had been filed.  Strengths and weaknesses in each party's theory of the case were evident at this time.  In the end Plaintiffs' counsel determined that continued litigation would be difficult, time-consuming, expensive, and a high risk.  The fact that contaminated gasoline had been released in 2001 and no tank had failed late in 2008 would have made the case for general causation (i.e. whether the contaminated gasoline was capable of causing compensable harm) difficult to explain to a jury.  Specific causation (i.e. whether contaminated gasoline caused compensable harm to any specific tank) would have been even more difficult and for most class member's tanks could not even have been presented until another phase of trial, not yet scheduled as part of the litigation.  With significant hurdles remaining, the settlement providing some cash in hand and a protection against future tank failures was a good result for the class.  However, it can hardly be described as an unqualified success when the ultimate result is compared with the amount in controversy.  Plaintiffs' counsel deserves to be paid a fair percentage

---

[6]The difficulty of recovery is not the only factor which weighs against a $10 million dollar cash value of the settlement fund.  Class members do not get to retain any benefit of their insurance rights, like they would if recovery was by way of a verdict.  Instead, they must pursue insurance claims as a pre-condition to making a claim against the Tank Failure Fund. **Any insurance benefits must be assigned to Defendants.**

for their efforts, but this percentage should not be so much that it diminishes the small cash award available to the class.

### B. Plaintiffs Were Represented by Able Counsel Who Skillfully Brought the Case to a Close.

Despite the fact class members' recovery was not as high as they had hoped for, there is little other basis on which to criticize counsel's skill or effort. The local lawfirm representing the class, Goodwin and Goodwin, has a stellar regional reputation. They initiated this lawsuit along with James Cawley, a Texas based attorney specializing in oil and gas law. Although this is the Court's first experience with Mr. Cawley, he is obviously proficient and undoubtedly lent valuable expertise. When it became obvious that this case might become a large and complicated class-action lawsuit, Plaintiffs' attorneys decided to bring in class action specialists from the lawfirm of Cunningham Bound LLC. The Court understands the firm to be well respected in the area of class action tort litigation, and was favorably impressed with their skill during oral argument.

Navigating the case through a complex course of discovery, class certification and extended motions practice took skill, effort, and time. As already mentioned, Defendants put up a vigorous defense at every legitimate opportunity. Plaintiffs' attorneys and their staff put in a considerable amount of time. The Court has no reason to doubt the sworn affidavits of counsel which posit total attorney hours of 20,782 and 18,066 hours devoted by legal assistants. On their face, the great number of hours devoted to the case might lead one to suspect inefficiency; the complexity of the case, however, counsels against that conclusion. Given these considerations, the time estimates are within the bounds of reason and do not raise suspicion that needless hours were devoted to the case. The Court was favorably impressed with the litigation skills displayed by all of the attorneys

-11-

involved.  The consideration of time, effort, and skill of the attorneys justifies a percent of fund recovery on par with cases achieving similar results.

### C.  This Was a Complicated Case Which Lasted Over Five Years.

The Court understands that nearly every aspect of this case was burdensome – from the mountain of paper (as evidenced by $72,000 in disputed copy fees), to the difficulty of examining underground storage tanks, to the research which must have gone into the presentation of novel questions of law to the Court.   When background investigation before filing is considered, the attorneys spent more than five years investigating and litigating this case.  Plaintiffs' counsel participated in more than 80 depositions.  The total time devoted is equivalent to around the clock work for 1618 days, and surely means that several attorneys spent the vast majority of their professional time on this case during the five years of preparation and litigation. The Court's docket sheet indicates over 800 separate filings in this action.  The factual issues in this case were challenging and required the parties to retain dozens of experts.  Similarly, the legal issues were often novel and doubtless required substantial time to research and brief.  In short, this was one of the most lengthy and complicated cases I have seen in my 12 year tenure on the federal bench. Again, the complexities of the case warrant a fee in line with that recovered in similar cases.

### D.  There Was Some Risk of No Recovery, But Recovery Was the Probable Result.

Despite the skill and competence of class counsel, there existed some risk of non-recovery throughout litigation.  The case might not have been profitable at all if the Court refused class certification.  This hurdle was not cleared until the parties had devoted three years of their time and substantial sums of money to the matter.  The case also presented complicated issues of law and fact without readily analogous case law from which to pattern a litigation strategy or forecast a result.

-12-

The attorneys funded the case themselves and put in a substantial portion of their firms' resources into this litigation. These kinds of uncertainties are typically cited as a factor for justifying a high fee. *See e.g. In re Prudential Securities Inc. Ltd. P'ships Litig.*, 985 F.Supp. 410, 417 (S.D. N.Y. 1997). The Court agrees that attorneys should be rewarded for taking on significant risks, and believes that risks were present here. It is also the Court's view, however, that the magnitude of risk is often overstated in the case law and that the **divergence of risk between class members and counsel is often overlooked.**

As any judge or experienced attorney realizes, the vast majority of cases, even extremely complicated ones, settle.[7] It is hard to determine the exact motivations that lead parties to settle, but many commentators have put forth theories. *See See e.g.* Samuel R. Gross & Kent D. Syverud*, Getting to No: A Study of Settlement Negotiations and the Selection of Cases for Trial*, 90 Mich. L. Rev. 319, 320); George L. Priest & Benjamin Klein*, The Selection of Disputes for Litigation*, 13 J. Legal Stud. 1 (1984); George L. Priest, *Reexamining the Selection Hypothesis*, 14 J. Legal Stud. 215 (1985); Robert H. Moonkin & Lewis Kornhauser, *Bargaining in the Shadow of the Law: the Case of Divorce*, 88 Yale L.J. 950 (1979); Robert Cooter et al.; *Bargaining in the Shadow of the Law: A Testable Model of Strategic Behavior*, 11 J. Legal Stud. 225 (1982). One of the most basic and longstanding of these theories is that parties are rational actors who will settle when they feel that

[7]According to data compiled by the U.S. Department of Justice, Bureau of Justice Statistics, only around 3 percent of civil cases brought in state courts during the 2005 calendar year went to trial. Langston and Cohen, *Civil Bench and Jury Trials in State Courts*, *2005,* Bureau of Justice Statistics Special Report, October 2008. The Bureau of Justice Statistics website additionally states that only 2 percent of tort cases brought in federal court were decided by a bench or jury trial. U.S. Department of Justice, Civil Justice Statistics, http://www.ojp.usdoj.gov/bjs/civil.htm., revised October 28, 2008. In fact, many legal scholars see trial as a failure of litigation process. *See e.g.,*Samuel R. Gross & Kent D. Syverud*, Getting to No: A Study of Settlement Negotiations and the Selection of Cases for Trial*, 90 Mich. L. Rev. 319, 320 (The first sentence of the article explains, "[a] trial is a failure.")

it is in their own economic best interest.  Under this economic theory, each party's value of the case is based on their assessment of the plaintiff's likelihood of success at trial, the size of the judgment if plaintiff is successful, and the cost of litigation.  *See* Priest & Klein, *The Selection of Disputes for Litigation*, *supra*.  The plaintiff's value is thus the likelihood of success multiplied by the anticipated verdict, minus the expected trial costs.  *Id.*  The defendant's value is the plaintiff's likelihood of success multiplied by the anticipated verdict,  plus the costs of defense.  *Id.*  Settlement is probable when a plaintiff's value and defendant's value of the case are close together.[8]  *Id.*

If the potential plaintiff's verdict is extremely high, or if future litigation is expected to be very expensive, a case may retain significant value even if the plaintiff's likelihood of success is relatively small.   In this case, a verdict for the plaintiff class could potentially have been enormous.  Although the case was near the first phase of trial, the costs for continued litigation, into subsequent phases, would have been steep. Because of the extremity of the potential verdict and the high anticipated costs, Defendants would have maintained a reasonably high value for the case even if they were confident they would ultimately prevail at trial.[9]   Plaintiffs' counsel could always maintain some leverage in settlement negotiations because of the high potential verdict and Defendants' corresponding value of the case.  While the risk of zero recovery was always present, it was never a likely result as there was always a strong incentive to settle.

---

[8]More refined versions of the theory recognize that parties may estimate not only the maximum recovery possible, but other possible recoveries as well, discounting each by the probability of its occurrence. The same general principal still applies. *See e.g.* Howard Raiffa, The Art and Science of Negotiation c.5 (1982); Marjorie Anne McDiarmid, *Lawyer Decision Making: The Problem of Prediction*, 1992 Wis. L. Rev. 1847.

[9]Putting costs to the side, if the potential verdict is valued at $1 billion and the agreed value of the case is the final settlement value ($15 million to $25 million), the parties' estimates of Plaintiffs' likelihood of success would have been around two to three percent.

The risk to class members, although aligned with that of the attorneys, was not congruent. The damages sought represented an estimate of the class members' actual damages times a punitive damage multiplier. Both the class and their attorneys faced outcomes in this case ranging from a full award of the amount in controversy to recovery of nothing. The most likely result, however, was always somewhere in between. A recovery constituting a small fraction of the damages sought is enough to cover the attorneys' expenses and compensate them at a decent hourly rate; the same recovery may not be enough to fully compensate class members if they must replace their tanks. Class members still bear a substantial risk that their tanks are damaged and must be replaced. Counsel had a more limited risk throughout litigation and have eliminated any remaining risk with the current settlement. While counsel's risk was real, it does not justify a higher percentage of recovery figure. Plaintiffs' counsel deserve to be paid for the efforts, but their payment should not subsume the amount of money available to the class.

**E. A 25 Percent Fee Is Near the Average Awarded by Courts in Similar Litigation.**

In a recent case decided in the Southern District of West Virginia, Judge Copenhaver stated that a one-third attorneys fee is presumptively reasonable. *Muhammad v. National City Mortg., Inc.* --- F.Supp. 2d ----, 2008 WL 5377783 (S.D. W.Va. 2008). This figure commonly appears in the case law and is based on the figure that plaintiff's counsel routinely negotiate for their services prior to taking on a case. *See e.g. Muhammad* at * 8; *Eriksen Const. Co., Inc. v. Morey*, 923 F.Supp. 878, 881 (S.D. W.Va. 1996). Class actions, however, are not routine cases. The potential reward for plaintiffs' counsel in class action litigation is much higher than when an attorney litigates for an individual. Class actions are often initiated by attorneys. An individual class member has much less influence on his or her attorney, and thus counsel has far more control of litigation in the class action

-15-

context than when litigating for an individual.  When all of these considerations are taken into account, it is worth questioning whether the one-third fee holds up in the class action context.

It would be nearly impossible for this Court to devote the time and attention necessary to evaluate hundreds of class action settlements and come up with a median or average fee amount in similar cases.  Fortunately, legal scholars have already gathered this kind of empirical data.  A 1996 Federal Judiciary Study examining class actions in four federal courts from July 1, 1992 through June 30, 1994, for example, found median fee awards between 24 and 30 percent of class recovery; significantly below the oft-cited one-third figure.  Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996).   A more recent publication tested the assumption on larger data sets, covering cases settled between 1993-2002.  *See* Thomas Eisenberg and Geoffrey P. Miller, *Attorneys Fees in Class Action Settlements: An Empirical Study*, 1 Journal of Empirical Legal Studies, 27 (2004).  These authors found that "in non-fee shifting cases, the axiomatic one-third fee is inaccurate; a fee of 20 to 25 percent of the recovery better describes reality."  *Id.* at 50.  Evaluating factors commonly used by courts to evaluate class actions, and similar to those used by this Court, they found that the result achieved for the class was the best indicator of percent recovery from the common fund (and that the other factors were essentially washed out by the importance of the result).  *Id.*  at 28.  They also discovered that a scaling effect existed, dependant upon the amount of recovery.  *Id.*  As such, the authors suggested courts look to similar cases that resulted in a recovery of a similar amount to evaluate a request for attorneys' fees.  *Id.* at 72 - 76.  When they examined published opinion data within the time frame of their study, they found that in cases with recovery between $15 million and $22 million the mean attorneys' fee was 22 percent.  *Id.* at 73.

The median fee was 24.5 percent.  *Id.*  Because the Eisenberg and Miller study was a far more comprehensive analysis of similar cases than this Court could hope to achieve in a reasonable time, the Court accepts their results as a benchmark on which to judge a reasonable fee in this case.

**F.     A Number of Class Members Objected to the Requested Attorneys' Fees.**

Fifteen organizations representing 300 commercial gas stations, each with underground storage tanks within the class definition, filed objections in this case.  The objectors' main argument that was that the Tank Failure Fund was largely illusory and should not be considered as part of the recovery.  The large number of objectors, and the persuasiveness of their arguments, factor into the Court's determination of the attorney fee.

**G.     Public Policy Favors an Award of Reasonable Attorneys' Fees, But Not Overcompensation.**

The public policy prong of analysis cuts in two directions: On the one-hand, "there is a perception among a significant part of the non-lawyer population and even among lawyers and judges that the risk premium is too high in class action cases and that class action plaintiffs' lawyers are overcompensated for the work that they do."  *Jones*, 2009 WL 585782 at 14 (quoting Third Circuit Judicial Task Force Report, 208 F.R.D. 340, 344 (January 15, 2002)); on the other hand, there is a policy that attorneys' fees should be sufficient "to ensure that competent, experienced, counsel will be encouraged to undertake the often risky and arduous task of representing a class. . ." *Id.* (quoting *In re Microstrategy*, 172 F.Supp. 2d at 788.).

The Court considers both of these interests when it calculates the attorneys' fee.  The fee should be high enough that these particular attorneys, skilled as they are, are not put in a financial situation where they will be unable or unwilling to pursue similar types of class action litigation in the future.  Nor should the approved fee set a precedent that might dissuade others from taking on

-17-

this kind of litigation in the Southern District of West Virginia. The fee should not be so high, however, as to overcompensate plaintiffs' counsel at the expense of the class, or to create a perception of such overcompensation. While a reasonable fee must be awarded to accommodate the former policy consideration, the Court cannot help but think that an attorney payment outweighing payment to the class would do harm to the latter policy consideration.

## II.    A Fee of $4.25 Million Is Reasonable Under the *Jones* Factors.

Considering all the factors enunciated above, the Court hereby **GRANTS** the motion for attorneys' fees, but for a lower amount than requested by Plaintiffs' counsel. The total fee shall be $4.25 million, paid from the Cash Fund. This amount includes a 25 percent payment,$3.75 million, for the benefit of the Cash Fund, and a flat $500,000 for the benefit of the Tank Failure Fund. The $4.25 million payment from the Cash Fund is a fair payment for the work performed in light of the recovery obtained for the class. It will fairly compensate the attorneys for the risks they took in bringing this case, the challenges it presented, and the skill with which they brought it to fruition. It is slightly higher than the average attorney fee payment in class action cases with similar magnitudes of recovery, but less than that requested, and justified by the complexity of litigation. Although the payment still represents a sizeable sum of the cash to be awarded, especially when costs are included, the $4.25 million fee is a reasonable balance of the public policy considerations and will not be an inequitable result for either the attorneys or the class.

The $500,000 payment for the benefit of the Tank Failure Fund would be a relatively small percentage if that fund were given full cash value. As already explained, however, recovery from the tank failure fund will be an expensive, time-consuming, and difficult prospect for any class member who attempts to make a claim. The most difficult issue of this litigation has been put off

-18-

until claims are made against the Tank Failure Fund.  Recovery from the Tank Failure Fund will be more limited than the recovery class members might have achieved with a favorable verdict.  The main benefit of the Tank Failure Fund is an extension of the statute of limitations to permit some recovery in the event of a future tank failure.  In the Court's estimation a reasonable payment based on the present value of that benefit is $500,000.

**III.    A Fee of $4.25 Million Is Reasonable Compared to the Lodestar Calculation.**

When the lodestar is used as a cross-check, the Court need not apply "the 'exhaustive scrutiny' normally required by that method."   *Jones*, 2009 WL 585782 at * 17 (quoting *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000)).  The Court will use counsels' own estimates of their hours they spent working on the case.  Counsel has also explained the hourly rates they used to calculate their lodestar and this, too, factors into the Court's analysis.

Counsel represented that the total time spent on this case was 20,782 attorney hours and 18,066 hours for legal assistants.  Their calculation of the un-enhanced lodestar is approximately $9 million.  Hourly rates used to calculate that rate varied somewhat more than one might typically expect.  Attorneys for Cunningham Bounds LLC. valued their partners' time at $650 per hour, senior associate time at $450 per hour, junior associate time at $375 per hour, and paralegal time at $175 per hour.  In contrast, attorneys from the law firm of Goodwin and Goodwin charged a maximum rate of $250 - $300 per hour (presumably partner time) and a minimum rate of $150 per hour (presumably for a junior associate).  James Cawley, the oil and gas specialist, valued his time at $200 per hour.  Plaintiffs' attorneys agreed that they would divide any fee among themselves, without involvement from the Court.  Although the Court will not be involved in disbursement of fees amongst counsel,

it cannot help but notice that the differential in hourly fees is striking (one firm charges substantially more for junior associate time than other firms charge for senior partner time).

The requested $6 million fee equates to payment of $236 per hour for attorney time and $60 for legal assistant time.  With the $4.25 million fee, justified by the percentage of fund method, the hourly rates obviously decrease.  A $4.25 million fee represents an average hourly rate of $175 for attorneys and $32 per hour for legal assistants.   While these would not be high rates in this market, neither are they unreasonably low for the area.  The hourly fee is in line with what the law-firms of Goodwin and Goodwin and James Cawley would typically charge for their services.  While it is well below the rates requested by Cunningham Bounds, LLC., those fees were among the highest that might be justified for any type of litigation in any market.  (In *Jones,* Judge Goodwin calculated the lodestar at the "top end of the market rate . . . approximately $500 per hour;" attorneys for Cunningham Bounds themselves stated that their hourly rate was commensurate with rates of firms in large cities).

In light of the result achieved and the percent of fund calculation, the hourly figures are within reason.  Plaintiffs' counsel will not be compensated at quite so high a rate as they may have been able to negotiate for an hourly fee.  Their requested fee was 66 percent of the un-enhanced lodestar; the fee awarded is just under 50 percent of the un-enhanced lodestar.  This is undoubtedly not what counsel hoped for when they initiated the case, but when the percentage of fund factors –particularly the result obtained – are considered, it is a fair payment.

**IV.    Plaintiffs' Counsel Shall Be Fully Reimbursed for the Costs Expended.**

In addition to the $4.25 million in fees, Plaintiffs' counsel shall be fully reimbursed for the costs incurred while litigating this matter.  At the time of the final fairness hearing, the total costs

-20-

were calculated to be $3,134,600.53; it would be reasonable for counsel to have occurred some additional costs during the administration of settlement.  "Costs that are 'reasonable in nature and amount may be reimbursed from the common fund.'"  *Jones* 2009 WL 585782 at * 20 (quoting *In re Microstrategy*, 172 F.Supp. 2d at 791.  Costs should "reflect a reasonable amount of expenditures for a case of [its] magnitude" and be "borne equally by the beneficiaries of the class action."  *Id.* (quoting *Strang v. JHM Mort. Securities Ltd Partnership*, 890 F.Supp. 499, 503 (E.D. Va. 1995).

The only objection to the costs incurred was the interest on a special line of credit, opened for the sole purpose of funding this case.  While objectors characterize that interest as an overhead cost, not to be reimbursed from class funds, it is clear that those costs were necessary to pursue this litigation.  Without the expenditure of those funds, it is probable that counsel would not have had enough funds to pursue this case.

Addressing costs more generally, $3 million is doubtless a large amount.  It is, however, justified by the complexity of this case.  Plaintiffs and Defendants retained dozens of experts, requiring plaintiffs' counsel to participate in over 80 depositions.  The costs of examining and testing underground storage tanks were high.  A $3 million expenditure was reasonable for a case of this magnitude and complexity.

## V.    Representative Class Members Shall Each Be Paid an Incentive Fee of $25,000

Incentive fees are commonly granted to encourage socially beneficial litigation and compensated named plaintiffs for expenses on travel, incidental costs, and their time.  *See Jones,* 2009 WL 585782 at * 20; *Muhammed*, 2008WL 5377783 at *9.  The $25,000 incentive fee requested for named class representatives is reasonable when the duties of these members are considered; it is comparable with incentive fees paid in other cases of similar magnitude.  It shall be awarded in full.

-21-

## Conclusion

For the above stated reasons, the Court **GRANTS in part** Class Counsel's Motion for Award of Attorneys' Fees and Reimbursement of Costs and Award of Incentive Fee (Doc. 809). The Court **DENIES** counsel's request for $6 million in fees, but **GRANTS** an award of $4.25 million plus the requested expenses. In addition the incentive fee of $25,000 for each named class representative is approved. Disbursement of fees and costs shall be made from the Cash Fund. The remainder of that fund shall be distributed according to the settlement procedures already approved by this Court. Administration of the Tank Failure Fund shall also accord with that plan.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        May 7, 2009

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE